IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 15, 2011 Session

## STATE OF TENNESSEE v. TODD JOSEPH SWEET a/k/a JAMIE LEE TURPIN

**Direct Appeal from the Circuit Court for Monroe County**
**No. 08-082    Carroll L. Ross, Judge**

---

**No. E2010-00729-CCA-R3-CD - Filed December 22, 2011**

---

A Monroe County jury convicted the Defendant, Todd Joseph Sweet, of theft greater than $10,000, and the trial court sentenced him to six years in the Tennessee Department of Correction, to be served consecutively to a sentence he received in a separate case, case number 08-081. In this appeal, the Defendant contends: (1) the trial court improperly denied his motion to dismiss for the State's failure to comply with the Interstate Compact on Detainers; (2) the trial court improperly refused to remove for cause a juror who had previous knowledge of other crimes the Defendant allegedly committed; (3) the State failed to comply with Tennessee Rule of Criminal Procedure 16 when it failed to provide the Defendant's trial counsel with letters written by the Defendant and intercepted by the Monroe County Sheriff's Department; (4) the State failed to disclose exculpatory evidence; (5) the trial court improperly admitted evidence that the Defendant had committed other crimes; (6) the trial court improperly denied the Defendant's motion for a mistrial; (7) the trial court improperly instructed the jury; (8) the trial court improperly denied the Defendant's Motion to Strike the State's Notice of Impeachment; (9) the evidence was insufficient to support his conviction; and (10) the trial court improperly sentenced the Defendant to the maximum sentence within his range and improperly ordered that his sentence run consecutively to a sentence he had previously received in a separate case. After a thorough review of the record and relevant authorities, we conclude that there exists no error in the trial court's judgment. We therefore affirm the judgment and sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, J., joined. DAVID H. WELLES, Sp. J., not participating.

Robert L. Jolley, Jr., Knoxville, Tennessee, for the Appellant, Todd Joseph Sweet.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Steven Bebb, District Attorney General, and Paul Rush, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant's unauthorized taking of a vehicle valued over $10,000. Based on this conduct, on April 3, 2008, a Monroe County grand jury indicted the Defendant in case number 08-082 with one count of theft greater than $10,000. In a separate indictment issued for a separate incident, the grand jury charged the Defendant in case number 08-081 with four counts of criminal simulation and four counts of forgery.[1]

### A. Procedural History

During the Defendant's November 17, 2008, arraignment, the trial court inquired about the Defendant's ability to hire an attorney. The trial court first swore in the Defendant, who then testified that the TBI had seized the land that he owned. Upon further questioning by the trial court, the Defendant testified that, while he did not have any money in the United States, he had "[m]ulti-millions" in an account in Malaysia. The trial court informed the Defendant that, based on these assets, he would be required to hire his own attorney, to which the Defendant responded, "Okay." The trial court set an "attorney date" for January 26, 2009, informing the Defendant that he would need to be present in court with his attorney on that date.

On January 26, 2009, the State informed the trial court that the Defendant had come to Monroe County from another state in November and that, according to the Interstate Compact, the State only had six months to try at least one of his cases. The trial court noted that the Defendant did not have an attorney present, and the Defendant said he had not hired one. The Defendant requested the trial judge "contact the U.S. Department of Homeland Security" because there were "explosives sitting in Sweetwater right now." The trial court informed the Defendant that, as a judge, he could not comply with this request to contact the U.S. Department of Homeland Security, and he asked the Defendant to fill out an affidavit of indigency. The Defendant said he would not do so because he was "not going to perjure [him]self." The trial court implored him to simply tell the truth.

---

[1]A Monroe County jury convicted the Defendant of all of the counts against him in case number 08-081. The Defendant appealed those convictions, and this Court heard oral arguments in both the Defendant's cases on the same day, February 15, 2011. These cases were not, however, consolidated, and a separate opinion will be issued on each case.

The Defendant then filled out the affidavit, was sworn by the trial court, and maintained that he had over ten million dollars in off-shore bank accounts. The Defendant further claimed that he owned vehicles valued at $750,000, trucks valued at $200,000, snowmobiles valued at $20,000, and two motorcycles. The Defendant said that he could not access his money "from here." The trial court expressed doubt about the accuracy of the Defendant's testimony and appointed him an attorney. The trial court stated that the State needed to proceed on at least one of the indictments by April 13, and the State informed the trial court that it would proceed on indictment 08-081. The trial court set a trial date for case 08-081 for February 24, 2009.

On February 23, 2009, the State requested a continuance for the trial because the victim, who resided in Canada, was not present. After expressing some displeasure with the State, the trial court reset the case for trial on April 14, 2009, with the understanding that this trial date was still within the six-month time frame contemplated by the Interstate Compact.

## B. Motion to Dismiss Based on Interstate Compact Violation

On April 9, 2009, the Defendant moved to dismiss the charges against him in case number 08-081, 08-082, and another related case, 08-456, based on the State's failure to commence trial on any of the three indictments within the 180-day Compact period, and he moved to strike the State's "Notice of Intent to Seek Enhanced Punishment and/or Notice of Impeaching Convictions," arguing that the State should have filed this notice before the day trial was originally set to begin. At the April 13 status hearing, the trial court heard arguments on the Defendant's motions. The Defendant argued his motion to dismiss should be granted because the 180-day period contemplated by the Interstate Compact was triggered by the Defendant's request to the District Attorney's office that he be tried, which was received by the District Attorney's office on October 10, 2008. The Defendant asserted, therefore, that the time period within which he must be tried expired on April 8, 2009. The trial court denied the motion with respect to case number 08-081, finding that the Defendant was responsible for delaying the trial for two months by stating that he had millions of dollars in assets with which he could hire his own attorney and by "insist[ing] that he wanted to hire his attorney." Further, the trial court found that the State in "good faith" requested a continuance in order to arrange for a witness to travel from Canada. The trial court refrained from ruling on the Defendant's motion with respect to case number 08-082, reserving ruling on that until the time of Defendant's trial in that case.

The Defendant also argued that the trial court should grant his motion to strike the State's "Notice of Intent to Seek Enhanced Punishment and/or Notice of Impeaching Convictions" because the State should have filed its notice ten days prior to the original February 24 trial date. The State responded that it was delayed in discovering the

Defendant's prior convictions because the Defendant had operated under a variety of aliases. The Defendant responded that the Defendant's convictions were under the name "Todd Joseph Sweet," the same name under which he was indicted in the present case. The record includes copies of the Defendant's criminal convictions from Michigan, which indeed list the Defendant's name as "Todd Joseph Sweet." The trial court found that the State filed the notice more than ten days before the April 13th trial date, in compliance with Tennessee Rule of Criminal Procedure 12.3's notice provisions, and refused to grant the Defendant's motion.

The following day, the Defendant's trial in case number 08-081 was held. He was convicted of four of the eight charges alleged in the indictment. His trial on the indictment from which this appeal stems was subsequently scheduled for June 22, 2009.

On June 22, 2009, the Defendant renewed his motion to dismiss the indictment in case number 08-082 based on the State's failure to comply with the Interstate Compact's 180-day rule. Defense counsel argued that the Defendant's case had not been tried within the 180-day time period articulated in the Interstate Compact. Further, he contended that, even assuming the Defendant was responsible for a two month delay because he claimed to possess vast financial resources, it had been between 185 days and 189 days since the trial court declared the Defendant indigent and appointed counsel. The trial court, adopting an interpretation of the Compact proffered by the State, ruled that, because the Defendant was transferred in order to dispose of "multiple indictments," those being indictments in Case Number 08-081 and 08-082, the Defendant's trial in case number 08-082 need only to "reasonably follow" his trial in case number 08-081. Finding that it would have been "logistically impossible" for the State to try the Defendant on both cases within the 180-day period, the trial court found that the State complied with the Interstate Compact by trying the Defendant on case number 08-082 within a reasonable time after his trial in case number 08-081.

During this hearing, the parties informed the trial court that they had recently become aware that, at some point before the Defendant's trial in case number 08-081, the Monroe County Sheriff's Department began intercepting and confiscating the Defendant's mail. At this point, the parties were aware that the intercepted mail included letters written to an attorney in Tennessee, the FBI, the ATF, an attorney in Arizona, and Donna Poe (the niece of the victim in this case). Defense counsel argued that the State's failure to disclose the content of these letters constituted a violation of Tennessee Rule of Criminal Procedure 16, which requires the State to disclose to the Defendant any written statement made by him to a law enforcement agency. He asked the trial court to take possession of the letters and disclose to him all unprivileged material. He also argued that the State interfered with the Defendant's attorney-client privilege by intercepting the Defendant's letters addressed to attorneys. The trial court declined to rule on the State's compliance with Rule 16 before trial. The Defendant's trial took place on the following day, June 22, 2009.

## B. Trial Facts

At the Defendant's trial, the following evidence was presented: William Danny Poe testified that he had lived in Sweetwater, Tennessee, for the entirety of his life. Poe met the Defendant when Poe's niece, Donna Poe, brought the Defendant to Poe's house and introduced him as her boyfriend. Donna Poe and the Defendant were looking for some pistol shells for a pistol used by Donna Poe's father, who was also William Poe's brother. The Defendant introduced himself as Jamie Lee Turpin and told Poe that he had served in Iraq and that he was considered a "high roller" with some casinos in Las Vegas. The Defendant led Poe to believe that the Defendant's life was in danger, based upon the Defendant's assertions that"people" were out to kill him, in part because of his activities in the casinos.

William Poe testified that the second time he met the Defendant was when Poe went to a party at the home of Donna Poe and the Defendant. He said there were "a lot of big wheels out of Sweetwater there" and Poe stayed a couple of hours, during which he only spoke with the Defendant "a little bit." At some point after this, William Poe began working for the Defendant, whom he still knew as Jamie Turpin. During the duration of Poe's relationship with the Defendant, the Defendant never informed him that his real name was Todd Sweet.

William Poe said that in February 2008, he traded in a 2002 Dodge pick-up truck and purchased a 2005 pick up truck, which was then valued at $29,000. Poe testified that, on March 10, 2008, he saw the Defendant at the home the Defendant shared with Donna Poe. It was on this date that William Poe agreed to work for the Defendant. Later that evening, the Defendant and Donna Poe came to William Poe's house, where Donna Poe informed William Poe that the Defendant, who was standing outside in the driveway, needed to see him. William Poe went to speak with the Defendant while Donna Poe remained on the porch.

William Poe recounted this conversation, saying that the Defendant, who was living at the time at a farm owned by A.J. Smith, told him, "There's people everywhere over at the farm. I don't know who it is. I need to borrow one of those trucks so they'll . . . not know what I'm in right now. And I'll be back tomorrow and straighten this all out." William Poe said he told the Defendant he could have his truck for the night but that he needed it back the next day, to which the Defendant responded that he would return the truck the following day. The Defendant and Donna Poe left in William Poe's truck, leaving behind the Jeep Cherokee in which they had arrived. Before leaving, the Defendant, indicating toward the Jeep, said "I don't care what you do with that," and the Defendant left the keys for the Jeep inside the Jeep.

The Defendant called him later that night and asked for money, and William Poe asked him where he was located. The Defendant said he did not know, and the conversation ended. Poe said that, later, as a result of listening to his police scanner, he called his son's cell phone and someone other than his son, a man named "Marty Kyle", answered. Kyle, William Poe explained, was employed with the Sweetwater Police Department. After speaking with Kyle, William Poe became suspicious of the Defendant, and he provided Kyle with the description of his truck that he had allowed the Defendant to drive.

William Poe testified that the Defendant did not return the following day, and he never heard from him again. The Defendant never called him or sent him a text message to inform him of the whereabouts of the truck. William Poe said that, a month later, police called him and informed him that his truck had been found in Bowling Green, Kentucky. Poe traveled to Bowling Green to inspect the truck, which he said was not damaged but which he had to leave there because there was no key left with the truck. Poe returned to Knoxville and employed a courier service to bring the truck back to Sweetwater, which cost him $400. When his truck was returned to him, Poe noticed that there were several things missing, including two GPS units, thirty CDs, a clipboard upon which his resume and FEMA certifications were clipped, a bag containing his "off-duty weapon," numerous holsters, and a "raid vest."

Poe testified that the next time he saw the Defendant was while Poe was working with the Sweetwater Police Department. Poe, along with some Sweetwater police officers, were taking a man to jail, and Poe inquired about whether the Defendant was present at the jail. Upon being informed the Defendant was present, jail employees escorted Poe to see the Defendant. At this point in the testimony, the Defendant's counsel moved for a mistrial, the grounds of which will be discussed in the relevant section below. Poe then testified that he did not see or talk to the Defendant from the day that the Defendant left in his truck in March 2008 until the end of November or the beginning of December 2008.

On cross-examination, William Poe testified that he worked for the Sweetwater Police Department for approximately three years, and that his son, his nephew, and Donna Poe's ex-husband all were also employed with the department. Poe testified that, while he did not have possession of his truck for seven weeks, he knew where the truck was located three weeks after the Defendant left in the truck. He explained that it took him several weeks to have the truck returned from Bowling Green to Sweetwater. William Poe agreed that, at the time of this incident, he had known the Defendant for only four months and that Donna Poe was six months pregnant with the Defendant's child. He was under the impression that, at that time, Donna Poe and the Defendant were married, but he later learned that was not true.

William Poe agreed that he moved the Jeep Cherokee next to his house before the

Defendant left in his truck. Poe said that, when he spoke with the Defendant later, the Defendant said to him, "Everything I've found in this truck , if you know what I mean, everything, is safe." Poe took this to mean that the Defendant had found the weapon Poe kept in his truck.

William Poe heard a "BOLO"[2] call over the police scanner for the Jeep Cherokee that the Defendant had left at his house. As a result of this, he called an officer and told them to cancel the "BOLO" on the Jeep and to "BOLO" Poe's truck instead. William Poe conceded that, when he later reported his vehicle stolen, he told Monroe County police officers that he allowed the Defendant to borrow his truck.

On redirect examination, William Poe testified that the Defendant never informed him that he was attempting to evade the police. Poe testified that he had assumed that the Defendant was evading police when he heard the "BOLO" call for the Defendant's car.

David Guy, a Special Agent with the Tennessee Bureau of Investigation ("TBI"), testified that the Defendant's real name was Todd Joseph Sweet, but that he used the alias of Jamie Lee Turpin. Agent Guy testified that he first made contact with the Defendant after the Defendant reported that Donna Poe had been threatened by her ex-husband, who was a Sweetwater Police officer. The Defendant informed the agent that he possessed a tape recording of a conversation during which Donna Poe's ex-husband threatened her. During Agent Guy's investigation, the Defendant alleged he had suffered a gunshot wound.

On cross-examination, Agent Guy testified that he interviewed several people involved with this case, including Donna Poe. He testified he also assisted in recovering William Poe's truck. Agent Guy agreed that William Poe told him during an interview that he had given his truck and the keys to the Defendant.

The Defendant elected to present no evidence. At the conclusion of the trial, the jury convicted the Defendant of theft of property valued at over $10,000 but less than $60,000. The trial court sentenced the Defendant to six years in the Tennessee Department of Correction, to be served consecutively to his sentence in case 08-081 and to his sentence resulting from his Michigan convictions.

The Defendant filed a motion for new trial, arguing, among other things, that he was not tried within the period contemplated by the Interstate Compact and that the delay in bringing him to trial was attributable, in part, to the State's confiscation of letters he wrote to attorneys. The trial court denied the Defendant's motion for new trial, and this appeal

---

[2]This term was never explained to the jury.

ensued.

## II. Analysis

On appeal, the Defendant contends: (1) the trial court improperly denied his motion to dismiss for the State's failure to comply with the Interstate Compact on Detainers; (2) the trial court improperly refused to remove for cause a juror who had previous knowledge of other crimes the Defendant allegedly committed; (3) the State failed to comply with Tennessee Rule of Criminal Procedure 16 when it failed to provide the Defendant's trial counsel with letters written by the Defendant and intercepted by the Monroe County Sheriff's Department; (4) the State failed to disclose exculpatory evidence; (5) the trial court improperly admitted evidence that the Defendant had committed other crimes; (6) the trial court improperly denied the Defendant's motion for a mistrial; (7) the trial court improperly instructed the jury; (8) the trial court improperly denied the Defendant's Motion to Strike the State's Notice of Impeachment; (9) the evidence was insufficient to support his conviction; and (10) the trial court improperly sentenced the Defendant to the maximum sentence within his range and improperly ordered that his sentence run consecutively to separate sentences he had previously received in different case.

### A. Interstate Compact

The Defendant contends the trial court improperly denied his motion to dismiss for the State's failure to comply with the Interstate Compact on Detainers. The Petitioner contends that he requested a disposition of the Tennessee charges pending against him on October 10, 2008, and that, therefore, the 180-day period within which he could be tried pursuant to the Interstate Compact began running on that date. His trial in this case was not held until June 23, 2009, which was 256 days after the October 10, 2008, request. The Defendant notes that the trial court found that part of the delay was attributable to him because he claimed to have the resources to afford his own attorney, but he asserts that he was not responsible for any delay because the Monroe County Sheriff's Department interfered with his ability to hire an attorney by confiscating his attempted communications with attorneys.

The State counters that the Defendant was arraigned on three separate indictments, one of which was case number 08-081 and another of which was this case, number 08-082. The State asserts the Defendant is not entitled to relief because he was tried on case number 08-081 on April 14, 2009, and, while that was 186 days after his October 10, 2008, notice, 98 days of that delay was attributable to the Defendant. Further, the State asserts, it did not act in bad faith when it sought a continuance based upon the inability to transport a witness who lived in Canada to Tennessee in time for the February trial date.

The Interstate Compact on Detainers is a uniform agreement, adopted by forty-eight states including Tennessee, which facilitates the interstate transfer of a prisoner for the purpose of disposing of the prisoner's pending out-of-state criminal charges, which may preclude the prisoner from early release consideration or alternatives to confinement. *See* T.C.A. § 40-31-101, *et seq.* (2006); *Nelms v. State*, 532 S.W.2d 923, 927 (Tenn. 1976). The stated purpose of the Interstate Compact is "to encourage the expeditious and orderly disposition of [outstanding] charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints." T.C.A. § 40-31-101, art. I. This Court is to construe the provisions of the Interstate Compact liberally in favor of the defendants it was intended to protect. *Garmon*, 972 S.W.2d at 710. Its protections, however, are statutory, rather than constitutional or jurisdictional. *Id.* (citing *Grizzell v. Tennessee*, 601 F. Supp. 230 (M.D. Tenn. 1984)).

Describing the interaction of the "sending" state in which a defendant is incarcerated and the "receiving" state that has lodged a detainer against a defendant, the Interstate Compact provides a process whereby the prisoner may demand that the receiving state dispose of charges relating to detainers lodged against the defendant by the receiving state during his temporary transfer to the receiving state. T.C.A. § 40-31-101, art. III(a)-(f). This demand, if carried out according to the procedure set out in the Interstate Compact, obliges the receiving state to try the defendant within 180 days or else forfeit prosecution of not only the charges underlying the detainer but also any other charge arising from the same criminal transaction. T.C.A. § 40-31-101, art. III(a); art. V(d). The 180-day period begins to run on the date the petition is received by the court and district attorney in the county where the charges are pending. *State v. Moore*, 774 S.W.2d 590, 593 (Tenn. 1989).

The 180-day period in which the State must try the defendant is not absolute; rather, it is subject to the trial court's ability to grant "any necessary or reasonable continuance" for "good cause shown":

> [Once a person has triggered the Compact's protections by causing both the State and the trial court to receive a copy of his Compact request,]the person shall be brought to trial within one hundred eighty days, . . . provided, that for good cause shown in open court, the prisoner or the prisoner's counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.

T.C.A. § 40-31-101, art. III(a). Neither a crowded docket nor the State's negligence constitutes "good cause" for a delay. *State v. Gipson*, 670 S.W.2d 637 (Tenn. Crim. App. 1984); *State v. Green*, 680 S.W.2d 474 (Tenn. Crim. App. 1984), *overruled on other grounds by Stave v. Moore*, 774 S.W.2d 590 (Tenn. 1989). Also, delay "occasioned by the defendant"

tolls the running of the180-day period. *State v. Dillon*, 844 S.W.2d 139, 142 (Tenn. 1992). The provisions of the Interstate Compact, however, are to be construed liberally in favor of the prisoners it was intended to benefit. *Gipson*, 670 S.W.2d at 639.

We held in *State v. Joseph Todd Sweet*, No. E2010-00728-CCA-R3-CD, 2011 WL 6318506, at *16-17 (Tenn. Crim. App., at Knoxville, Dec. 16, 2011) (hereinafter *Sweet I* ), the Defendant's appeal from case number 08-081, that there was "good cause" for the trial court to delay the Defendant's trial in case number 08-081 six days beyond the 180 day time period.

> The Defendant's actions "contributed to a substantial part of the delay of is trial," and the State's request for a continuance was not in bad faith or the result of a lack of diligence. Taking these considerations into account, we conclude that "good cause" existed for the delay of the Defendant's trial beyond the 180-day period contemplated by the Interstate Compact. *See Bobo*, 724 S.W.2d at 760. Because the Defendant's prosecution in this case did not violate the Interstate Compact, the trial court properly denied the Defendant's motion to dismiss. The Defendant is not entitled to relief on this issue.

*Id*. at *17.

The next issue we must address is whether the Defendant's trial in this case was also timely as defined by the Interstate Compact. The Defendant's trial in this case was held on June 23, 2009, which was 256 days after the October 10, 2008, request. The trial was held 70 days after the trial on indictment 08-081. While this issue is one of first impression in this state, it has been addressed by multiple courts in other states. The seemingly unanimous conclusion is that when a defendant must be tried on two or more separate and unrelated indictments in the same jurisdiction within the statutory period under the Interstate Compact, the time that a defendant is being tried on one indictment will toll the statutory time on the other indictments. *Stroble v. Egeler*, 408 F. Supp. 630, 635 (1976), *rev'd on other grounds*, 547 F.2d 339 (6th Cir. 1977), *cert. Denied*, 440 U.S. 940 (1979); *State v. McGann*, 493 A.2d 452, 456 (N.H. 1985); *State v. Peterson*, 47 P.3d 378, 380-81 (Idaho Ct. App. 2002); *Dobson v. United States*, 449 A.2d 1082, 1087 (D.C. 1982); *State v. Miller*, 691 A.2d 377, 396 (N.J. Super. Ct. App. Div. Apr. 3, 1997). Nothing in the Interstate Compact requires that the defendant be brought to trial on each and every indictment within the 180 days, and the subsequent trials should be commenced within a "reasonable time after resolution of the first trial." *McGann*, 493 A.2d at 456 (citing *Stroble*, 408 F. Supp. at 635).

We conclude in this case that the 70 days that passed between the Defendant's trial in case number 08-081 and case number 08-082 was reasonable. The trial court did not,

therefore, abuse its discretion when it denied the Defendant's motion to dismiss for the State's failure to try him within 180 days of October 10, 2008. The Defendant is not entitled to relief on this issue.

With regard to the Defendant's contention that no part of the delay was attributable to him because the Monroe County Sheriff's Department interfered with his ability to hire an attorney by confiscating his attempted communications with attorneys, we conclude that this Court has previously addressed that issue. In *Sweet I*, we held:

> The interception of the Defendant's letters, which is addressed later in the opinion, did not contribute to the delay of proceedings because, even had the Defendant appeared with privately retained counsel at the January 2009 attorney status hearing, the State was not prepared for trial on this date, as its request for a continuance at the February hearing revealed. Thus, even had private counsel appeared for the Defendant at his January hearing, the Defendant's case would not have proceeded to trial until April 14, 2009. As such, we conclude that the interception of the Defendant's attorney communications did not further delay the Defendant's trial and, as such, is not relevant to his claim that he was not tried in compliance with the Interstate Compact.

In this opinion, we affirm our previous holding and conclude the Defendant is not entitled to relief on this issue.

## B. Juror Removal

The Defendant contends that the trial court erred when it did not remove Juror Shadden[3] for cause based upon her knowledge of other crimes the Defendant "allegedly" committed. He further asserts that he was prejudiced because he had to exhaust one of his peremptory challenges to excuse Juror Shadden and, as a result, another juror who was also prejudiced, Juror Hester, was seated on the jury. He states that, in all, there were four jurors who were seated on his jury that claimed to have prior knowledge of his case, including Juror Hester. The State responds that the trial court properly declined to remove Juror Shadden for cause.

During voir dire the trial court asked Juror Shadden about whether she had any knowledge of any pretrial publicity involving the Defendant. Juror Shadden responded that she had read "a little bit in the paper about it," but that she did not recall what she had read.

_____

[3]We will refer to the members of the juror venire by their last names only.

The following exchange between the trial court and this juror then occurred:

> THE COURT: . . . [H]ave you, based on what you've read or heard, have you formed an opinion that you could not set aside and sit on this case with?
> JUROR [Shadden]: No.
> THE COURT: Okay. Could you listen to the evidence and base your decision only on the evidence that comes in through sworn testimony in this trial?
> JUROR [Shadden]: Yes, sir.
> THE COURT: Okay. You understand that everything you hear on the news is – just may not be true?
> JUROR [Shadden]: Not true.
> THE COURT: Okay. And it's not under oath, and a lot of times they are just repeating hearsay.
> JUROR [Shadden]: Yes.
> THE COURT: Do you understand that? Could you put all of that aside and only listen to the testimony and base your decision on the testimony here?
> JUROR [Shadden]: Yes.

The trial court then asked the State's attorney and the Defendant's attorney if they had any questions. The State declined to ask any questions, but the Defendant's attorney engaged in the following exchange with Shadden:

> [Defendant's Counsel]: [Juror Shadden], you mentioned you've read a little bit. What would have been your source, The Advocate, or The Buzz?
>
> JUROR [Shadden]: Advocate, . . . .
> [Defendant's Counsel]: . . . And do you recall how long ago? . . . .
> JUROR [Shadden]: Oh, there was something in it last night.
> [Defendant's Counsel]: Okay. Did you read that article?
> JUROR [Shadden]: Yes.
> [Defendant's Counsel]: Okay. Did you read the headline on that article?
> JUROR [Shadden]: Yes, but I don't recall it.

Juror Shadden went on to explain that she simply glanced through the article, which she recalled "pictured him as being a thief." She said, however, that she did not think that the article was "necessarily true." Juror Shadden said she did not recall the contents of the article, but she remembered something about a lot of cars. Juror Shadden said she had also

-12-

read previous articles about the Defendant, which she recalled described him as "a sweet talking fellow that . . . took advantage . . . of a bunch of people," and that he had been guilty of theft before in some other state. The trial court then inquired whether Juror Shadden could "put all of that aside and only listen to the evidence and base [her] decision on that," to which Juror Shadden responded, "Yes."

The trial court then informed the Defendant's counsel that he was not going to excuse Juror Shadden for cause. The Defendant used a peremptory strike to remove Juror Shadden. Later, the Defendant attempted to use a peremptory strike to remove a different juror, Juror Hester. The trial court informed the Defendant that he had already used his allotted eight peremptory strikes, and the Defendant again raised the issue of Juror Shadden. The trial court affirmed its decision with regard to Juror Shadden and Juror Hester was seated on the jury.

Article I, section 9 of the Tennessee Constitution guarantees a criminal defendant the right to trial "by an impartial jury." In fact, every accused is guaranteed "a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation." *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993) (citing *Tooms v. State*, 270 S.W.2d 649, 650 (Tenn. 1954)). In Tennessee, challenges to juror qualifications generally fall into two categories: propter defectum, "on account of defect"; or propter affectum "for or on account of some affection or prejudice." *Carruthers v. State*, 145 S.W.3d 85, 94 (Tenn. Crim. App. 2003); *Akins*, 867 S.W.2d at 355. General disqualifications such as alienage, family relationship, or statutory mandate are classified as propter defectum and must be challenged before the return of a jury verdict. *Akins*, 867 S.W.2d at 355. An objection based upon bias, prejudice, or partiality is classified as propter affectum and may be made after the jury verdict is returned. *Id.* "Where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the defendant to show that a juror is in some way biased or prejudiced." *State v. Caughron*, 855 S.W.2d 526, 539 (Tenn. 1993) (citing *Bowman v. State*, 598 S.W.2d 809, 812 (Tenn. Crim. App. 1980). The defendant bears the burden of proving a prima facie case of bias or partiality. *Id.* (citing *Taylor*, 669 S.W.2d at 700).

Relative to challenges of prospective jurors for cause, Rule 24(b), Tennessee Rules of Criminal Procedure, provides in part as follows:

Any party may challenge a prospective juror for cause if:

(1) There exists any ground for challenge for cause provided by law; or

(2) The prospective juror's exposure to potentially prejudicial

information makes him unacceptable as a juror.  Both the degree of exposure and the prospective juror's testimony as to his state of mind shall be considered in determining acceptability.  A prospective juror who states that he will be unable to overcome his preconceptions shall be subject to challenge for cause no matter how slight his exposure.  If he has seen or heard and if he remembers information that will be developed in the course of the trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his judgment will be affected, his acceptability shall depend on whether his testimony as to impartiality is believed.  If he admits to having formed an opinion, he shall be subject to challenge for cause unless the examination shows unequivocally that he can be impartial.

Although jurors may be excluded for cause if they have formed an opinion which will prevent impartiality, "[j]urors need not be totally ignorant of the facts of the case on which they sit [and even] the formation of an opinion on the merits will not disqualify a juror if [the juror] can lay aside [his or her] opinion and render a verdict based on the evidence presented." *State v. Howell*, 868 S.W.2d 238, 249 (Tenn. 1993).  The United States Supreme Court has made the following observation:

In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.

*Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961).  Thus, so long as a juror can set aside any previously-formed opinions and render a verdict based upon the evidence presented in court, the juror may properly participate in the case.  *Id.*  Irrespective of whether the trial judge should have excluded the challenged jurors for cause, any possible error is harmless unless the jury who actually heard the case was not fair and impartial.  *Howell*, 868 S.W.2d at 248; *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989).  The failure to correctly excuse a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him.  *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988); *State v. Jones*, 789 S.W.2d 545, 549 (Tenn. 1990).

In the case under submission, the Defendant did, in fact, exhaust all of his peremptory

challenges. There is no evidence, however, that the jury who heard the case was not fair and impartial. This alone prevents him the relief he seeks. We further conclude that the trial court did not err when it declined to excuse Juror Shadden for cause. The trial court pointedly asked Juror Shadden if she could put aside any previous knowledge of this case and "only listen to the evidence and base [her] decision on that," to which Juror Shadden responded, "Yes." Juror Shadden clearly stated she could set aside any previously-formed opinions and render a verdict based upon the evidence presented in court, meaning that she could properly participate in the case. See *Irvin*, 366 U.S. at 722-23. The Defendant is not entitled to relief on this issue.

## C. Letters

The Defendant contends the State failed to comply with Tennessee Rule of Criminal Procedure 16 when it failed to provide the Defendant's trial counsel with letters written by the Defendant and intercepted by the Monroe County Sheriff's Department. Before his trial, the Defendant's counsel informed the trial court that the State's attorney had told him about letters written by the Defendant that had been intercepted by the Monroe County Sheriff's Department. The State told the trial court that one of its investigators informed the State that the Monroe County Sheriff's Department had intercepted letters written by the Defendant and addressed to the ATF, the FBI, Attorney Randy Rogers, and a law firm in Arizona or California. The letters were dated in February and were still sealed.

The Defendant's counsel argued that the Sheriff's Department had no right to intercept or read these letters because they were "legal communication." The parties agreed that the letters to the attorneys were privileged. They contested, however, whether any letters to federal agencies such as the ATF or the FBI would be privileged. The State asserted that they neither possessed nor knew the contents of any of the letters.

At the close of the State's evidence, the Defendant again brought up the issue of letters confiscated by the Monroe County Sheriff's Department, which he said were necessary for his defense. The Defendant's attorney informed the trial court that, since the time of the Defendant's trial in case 08-081, the Sheriff's Department had intercepted letters written by the Defendant to his defense counsel. The letters purportedly included the questions defense counsel should ask potential witnesses during the trial and, defense counsel alleged, these letters were in the State's possession. The State informed the trial court that because the matter had been referred to the TBI when the State gained possession of the unopened letters the previous day, the letters were immediately transferred to the TBI. The State's attorney said it had informed defense counsel of this fact and that none of those letters were addressed to defense counsel.

On appeal, the Defendant contends that the State's failure to give him these letters hindered his ability to present a defense, particularly on the issue of whether he caused a delay in the trial by not hiring an attorney.

The record evinces that Tennessee officials took custody of the Defendant on November 13, 2008. The Defendant remained in the custody of the Monroe County Sheriff's Department while he awaited trial. His first trial, in case 08-081, commenced on April 16, 2009, and he was convicted of four of the charges in that case. At a hearing on the Defendant's motion for a new trial, proof submitted by the parties established that, while the Defendant awaited trial in the Monroe County Sheriff's Department, the Sheriff's Department intercepted several letters the Defendant attempted to send from jail. These letters included: one letter to Monroe County Sheriff's detective Pat Henry; three letters to the FBI; two letters to the ATF; one letter to the warden of the Arizona State Prison; one letter to an attorney in Arizona, Steven J.A. August; and one letter to an attorney in Athens, Tennessee, Randy Rogers. The trial court denied the Defendant's request to open and inspect the letters, and it denied the Defendant's motion for new trial.

Tennessee Rule of Criminal Procedure Rule 16(a)(1)(F) describes the circumstances under which the State must disclose certain "documents and objects":

> (F) Documents and Objects. Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings, or places, or copies or portions thereof, if the item is within the state's possession, custody, or control and:
> (i) the item is material to preparing the defense;
> (ii) the government intends to use the item in its case-in-chief at trial; or
> (iii) the item was obtained from or belongs to the defendant.

Tenn. R. Crim. P. 16(a). Rule 16(a)(1)(F) only applies to documents and tangible objects that are "within the possession, custody or control of the state." *See, e.g.*, *State v. Hutchison*, 898 S.W.2d 161, 167-68 (Tenn. 1994) (holding that where the State did not have certain documents in its control until the middle of the trial, introduction of the documents did not violate Rule 16); *also see State v. Elizabeth Gay Tindell*, No. E2008-02635-CCA-R3-CD, 2010 WL 2516875, *15 (Tenn. Crim. App., at Knoxville, June 22, 2010), *perm. app. denied* (Tenn. Nov. 17, 2010).

To enforce Rule 16, Rule 16(d)(2) provides that, if there has been noncompliance, the trial court may order the offending party to permit the discovery or inspection, grant a continuance, prohibit the introduction of the evidence not disclosed, or enter such other order

as the court deems just under the circumstances. *See State v. Leon Goins*, No. W1999-01681-CCA-R3-CD, 1999 WL 1531111, at *2 (Tenn. Crim. App., at Jackson, Dec. 27, 1999), *perm. app. denied* (Tenn. July 17, 2000). Whether a defendant has been prejudiced by the State's failure to disclose information is a significant factor in determining an appropriate remedy. *State v. Smith*, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995). The Defendant bears the burden of showing "the degree to which the impediments to discovery hindered trial preparation and defense at trial." *State v. Brown*, 836 S.W.2d 557, 560 (Tenn. 1993). The determination of the appropriate remedy is left to the sound discretion of the trial judge, which is exercised upon examination of the circumstances presented in that particular case. *State v. Underwood*, 669 S.W.2d 700, 703 (Tenn. Crim. App. 1984) (citing *McBee v. State*, 372 S.W.2d 173 (Tenn. 1963)). "Thus, it is clear that the court has wide discretion to fashion a remedy that is appropriate for the circumstances of each case and the sanction must fit the circumstances of that case." *Id.* (citations omitted); *see State v. James*, 688 S.W.2d 463, 466 (Tenn. Crim. App. 1984).

In this case, the Defendant's letters can be characterized as "document or object" "obtained from or belong[ing] to the defendant," whose disclosure Tennessee Rule of Criminal Procedure 16 (a)(1)(B) describes. Upon the State's failure to comply with Rule 16, in order for the trial court to determine an appropriate remedy, the Defendant bears the burden of showing "the degree to which the impediments to discovery hindered trial preparation and defense at trial." *Brown*, 836 S.W.2d at 560. From our review of the record, we discern no manner in which the Defendant was prejudiced by not having the letters. The Defendant fails to cite to any way in which discovery of the letters would have altered or aided the preparation of his defense in this case. As such, we conclude he is not entitled to relief on this issue.

## D. Exculpatory Evidence

The Defendant contends the State failed to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The Defendant notes that William Poe made a report that his truck was stolen to the Monroe County Sheriff's Department, which included a written statement. The Defendant asserts that he was not given a copy of this statement before trial and that the State's attorney had told him that there was no statement. It was not until William Poe testified at trial about his statement to police that the State provided the Defendant with a copy. The statement, taken and written out by "Deputy Wall," included a statement that Donna Poe and the Defendant came to William Poe's house to borrow a vehicle and "Mr. Poe agreed to allow them to borrow his vehicle." The Defendant asserts that this is exculpatory because it negates the element of theft that requires the property to be taken "without the owner's effective consent."

At trial, when this statement came to light, the Defendant objected. The trial court reminded Defendant's counsel that William Poe had testified at trial that he allowed the Defendant to borrow his truck but that he had asked him to return it the following day. The trial court said there was nothing in the statement that was different from William Poe's trial testimony. Defendant's counsel said that he should have been give this statement as part of discovery. The trial court reminded Defendant's counsel that he had known that William Poe said he allowed the Defendant to borrow the truck, knowledge evinced during opening statement when Defendant's counsel argued to the jury that this was not a theft case because William Poe had agreed to allow the Defendant to borrow his truck. The trial court found that the statements did not contain exculpatory evidence, but was *Jencks* material, so the Defendant was entitled to it upon the conclusion of William Poe's testimony.

In *Brady v. Maryland*, the United States Supreme Court held, "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The State does not have an obligation to disclose information that is not in the possession or control of the State. *Id.* (citing *Banks v. State*, 556 S.W.2d 88, 90 (1977)). A defendant must prove the following four prerequisites in order to establish a violation of due process under Brady:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
> 2. The State must have suppressed the information;
> 3. The information must have been favorable to the accused; and
> 4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). The defendant must prove these due process violation prerequisites by a preponderance of the evidence. *Id.* (citing *State v. Spurlock*, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993)).

Evidence that is "favorable to an accused" includes both "evidence deemed to be exculpatory in nature and evidence that could be used to impeach the State's witnesses." *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001). Favorable evidence has also been defined as:

> evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.

-18-

*Johnson*, 38 S.W.3d at 56-57 (quoting *Commonwealth v. Ellison*, 379 N.E.2d 560, 571 (1978)). The State has an obligation to disclose "any favorable evidence known to the others acting on the government's behalf in the case, including police." *Johnson*, 38 S.W.3d at 56 (quoting *Strickler v. Green*, 527 U.S. 263 (1999)). Additionally, "The duty to disclose exculpatory evidence extends to all 'favorable information' irrespective of whether the evidence is admissible at trial." *State v. Robinson*, 146 S.W.3d 469, 512 (Tenn. 2004) (citing *Johnson*, 38 S.W.3d at 56).

The Tennessee Supreme Court defined "material" within the context of *Brady*:

> Evidence is deemed to be material when " there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." [A] reviewing court must determine whether the defendant has shown that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict." In other words, evidence is material when, because of its absence, the defendant failed to receive a fair trial, "understood as a trial resulting in a verdict worthy of confidence."

*Johnson*, 38 S.W.3d at 58 (citations omitted) (emphasis added); *see Cauthern*, 145 S.W.3d 571, 598-99 (Tenn. Crim. App. 2004) (emphasis added) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

This Court must analyze the State's delayed disclosure of evidence differently than the State's non-disclosure of evidence. "Generally, if there is only a delayed disclosure of information, in contrast to a complete failure to disclose exculpatory information, *Brady* normally does not apply, unless the delay itself causes prejudice." *State v. Caughron*, 855 S.W.2d 526, 548 (Tenn.1993) (citations omitted); *State v. Joan Elizabeth Hall*, No. 01C01-9710-CC-00503, 1999 WL 34782, at *9 (Tenn. Crim. App., at Nashville, Jan. 28, 1999), *perm. app. denied* (Tenn. July 12, 1999). Where there is a delayed disclosure of evidence, this Court must determine whether the delay kept defense counsel from effectively using this evidence in presenting and preparing the defendant's case. *Caughron*, 855 S.W.2d at 548. "Delayed disclosure results in prejudice to the defendant and may deny the defendant due process when it is 'too late for the defendant to make use of any benefits of the evidence.'" *State v. Sidney M. Ewing*, No. 01C01-9612-CR-00531, 1998 WL 321932, at *8 (Tenn. Crim. App., at Nashville, June 19, 1998), *no Tenn. R. App. P. 11 application filed*. An incomplete response to a *Brady* request might cause the defense to "abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." *United States v. Bagley*, 473 U.S. 667, 682 (1985) (citation omitted). If the defense fails to request a continuance after receipt of the evidence, fails to call or recall a witness to testify

regarding the evidence, or fails to extensively cross-examine a witness regarding the evidence, the *Brady* violation may be cured. *Ewing*, 1998 WL 321932, at *9.

In the case under submission, the Defendant does not allege that the State failed to disclose this statement entirely but rather that it delayed the disclosure of the statement. We therefore must determine if the State's delay hindered the Defendant's ability to prepare for his defense. Applying the analysis enumerated in *Brady*, we conclude that the Defendant proved the first requirement, that the Defendant requested the information. The record proves that he specifically asked the State for any statements made by witness William Poe. Whether the State suppressed this information, as required by the second requirement of *Brady*, is arguable. The State had the statement in its possession and did not disclose it until Wiliam Poe testified at trial that he had given a statement to police. The statement does, however, clearly meet the third element of *Brady* by being "favorable to the accused." The statement William Poe gave to police states that he allowed the Defendant to "borrow" his truck, which corroborates the Defendant's story that William Poe allowed him to borrow the truck. We, however, cannot conclude that the information was "material." Evidence is deemed to be material when " there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Johnson*, 38 S.W.3d at 58. William Poe testified during the trial that he, in fact, allowed the Defendant to borrow his truck, but he said that the two agreed that the Defendant would return the truck the following day. This comports with what he told the police officer taking his complaint about his truck being stolen. He told the officer that he had allowed the Defendant to borrow his truck but that the Defendant had not returned the truck. We cannot conclude that this evidence was "material" as defined by *Brady*. Further, we fail to see how the delayed disclosure of this statement hindered the Defendant's ability to prepare for trial. The Defendant in fact argued in opening statements that William Poe had allowed him to borrow the truck, and William Poe testified in agreement with this during the trial. The State did not violate *Brady* when it delayed the disclosure of William Poe's statement to police. The Defendant is not entitled to relief on this issue.

### E.  Other Crimes

The Defendant next asserts that the trial court improperly admitted evidence that the Defendant had committed other crimes. In support of this contention, he points out that William Poe testified that, shortly after the Defendant left William Poe's house, William Poe heard over his police scanner a "BOLO," or be on the lookout, call for the Defendant's Jeep Cherokee. Poe testified he did not know the Defendant was hiding from "the law" and "trying to evade police" or William Poe never would have let him leave his driveway. Finally, the Defendant notes that William Poe testified that he had a conversation with the Defendant while the Defendant was in jail. He asserts the trial court erred when it admitted

this testimony.  The State asserts that the Defendant objected at trial and that the trial court sustained the objection.  Therefore, the State contends, he is not entitled to relief.

The Tennessee Rules of Evidence provide that all "relevant evidence is admissible" unless excluded by other evidentiary rules or applicable authority.  Tenn. R. Evid. 402.  Of course, "[e]vidence which is not relevant is not admissible."  Tenn. R. Evid. 402.  Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Tenn. R. Evid. 401.  Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Evidence of a defendant's character offered for the purpose of proving that the defendant acted in conformity with that character is not admissible.  Tenn. R. Evid. 404(a).  Additionally, evidence of other crimes, wrongs, or bad acts is not admissible to prove the character of a person to show action in conformity with that character.  Tenn. R. Evid. 404(b).  Such evidence may be admissible, however, for "other purposes" if the following conditions are met prior to admission of this type of proof:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).  Providing further clarification concerning the second requirement, "other purposes" have been defined to include: (1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident; (6) a common scheme or plan; (7) completion of the story; (8) opportunity; and (9) preparation. *State v. Robert Wayne Herron*, No. M2002-00951-CCA-R3-CD (Tenn. Crim. App. at Nashville, Jan. 22, 2003) (citing *Collard v. State*, 526 S.W.2d 112, 114 (Tenn.1975); Neil P. Cohen et al., TENNESSEE LAW OF EVIDENCE § 404.6 (3d ed. 1995)); *see also Advisory Comm'n Cmts.*, Tenn. R. Evid. 404; *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985); *Bunch v. State*, 605 S.W.2d 227, 229 (Tenn. 1980); *State v. Jones*, 15 S.W.3d 880, 894 (Tenn. Crim. App. 1999).

A trial court's decision as to the admissibility of evidence will be reversed only upon

a showing of abuse of discretion. *See State v. Powers*, 101 S.W.3d 383, 395 (Tenn. 2003); *State v. James*, 81 S.W.3d 751, 759 (Tenn. 2002). When attempting to exclude otherwise admissible and relevant evidence, the individual seeking exclusion bears a "significant burden of persuasion." *James*, 81 S.W.3d at 757-58.

## 1. BOLO Call

The Defendant first complains that the trial court admitted testimony that Poe contacted his son, also a police officer, after hearing a "BOLO" call over Poe's police scanner. During the Defendant's trial, the following occurred:

> [State's Attorney]: . . . Now you are an auxiliary police officer, is that correct?
> [Poe]: Yes.
> [State's Attorney]: With whom?
> [Poe]: Sweetwater Police Department.
> [State's Attorney]: And do you, in that capacity, listen to a scanner or anything like that?
> [Poe]: Yes, I do.
> [State's Attorney]: Okay. And what were you listening to on the scanner that day?
> [Poe]: I was listening to Sweetwater Police Department's state channel, and they BOLO'd out —
> [Defense Counsel]: your Honor, we object to hearsay.
> THE COURT: I'm going to sustain, not knowing where we're headed on this, but it's . . .
> [State's Attorney]: Okay.
> [Poe] They BOLO'd out the vehicle —
> [State's Attorney]: Hold on.
> THE COURT: I'm going to sustain the objection, so you cannot answer the questions as it's currently asked.
> [State's Attorney]: As a result of your listening to the scanner, who did you call?
> [Poe]: I tried to call – before they BOLO'd anything out, I called my son's cell phone.

The term BOLO was never explained to the jury, and the trial court sustained the objection. The trial court agreed with the Defendant that this testimony was not admissible. We first conclude that the trial court properly sustained the objection. We further conclude that, if there was any error, the Defendant is not entitled to relief because he failed to request a curative instruction. The failure to request a curative instruction is a failure to take action

to nullify or prevent harmful error. *See State v. Jones*, 733 S.W.2d 517, 522 (Tenn. Crim. App. 1987). An appellate court is not required to grant relief to a party who failed to take action to nullify a harmful error. *See* Tenn. R. App. P. 36(a). The Defendant is not entitled to relief on this issue.

As a final note, we mention here that the Defendant's counsel elicited more testimony about the "BOLO" and the effect of that "BOLO" on Poe during Poe's cross-examination. During cross, the following occurred:

> [Defense counsel]: [How do you know he left with no intention of returning your truck?]. So when did you find that out?
> [Poe]: I found that out – you really want to go into that? You really want me to answer that?
> [Defense counsel]: When did you find that out?
> [Poe]: I found that out when they BOLO'd out the Jeep he was in.
> [Defense counsel]: Okay.
> [Poe]: And I made a phone call to the farm he was supposed to be in, because earlier I had called and spoke to someone. I talked to an officer there and told them to cancel the BOLO on that Jeep, to BOLO my truck out.
> [Defense Counsel]: Okay. Now when – it was at that time you became concerned with your role in what happened, wasn't it, Mr. Poe?
> [Poe]: No. I'm not concerned –
> [Defense counsel]: So you were –
> [Poe]: What role? My truck was stolen.
> [Defense counsel]: You weren't . . . concerned that you had provided someone who you say you found out by a BOLO that the police officers were looking for with a means of leaving those police officers? You weren't concerned about that?
> [Poe]: Yes, I was concerned enough to inform the police officers to BOLO out my vehicle, sir.

The Defendant made no objection at this point about the reference by Poe to the "BOLO" of the Defendant's Jeep and, in fact, elicited this testimony. This further supports our finding that any error, if error exists, is harmless. *See* Tenn. R. App. P. 36(a).

## 2. Statements Regarding Defendant in Jail

The Defendant contends that William Poe improperly testified that he saw the Defendant while the Defendant was at the jail. The following occurred during the trial:

[State's Attorney]: When was the next time [after the Defendant left in your truck] that you saw the [D]efendant?

[Poe]: The next time I actually saw the [D]efendant, I was working with the Sweetwater Police Department. We brought someone over to the jail, and I asked if [the Defendant] was [t]here. And they replied, "yes, he's in the day room. Would you like to see him? At which time they took me down –

At that point, the Defendant's counsel objected and moved for a mistrial on the basis that the State had not turned over, pursuant to Rule 16, any statements purportedly made by the Defendant. The State responded that it had not asked William Poe about any statements but rather asked when was the next time he saw the Defendant. The State informed the trial court that it had previously informed the Defendant's counsel that William Poe had spoken with the Defendant at the jail. Defendant's counsel countered that, while the State had in fact provided him notice of this statement, the State had also said it had not planned to use any of those statements. The State responded that it was not trying to offer any statements the Defendant made but rather eliciting the testimony to show that William Poe had not spoken with the Defendant between the time that the truck was taken and the time he saw the Defendant at jail. The trial court ruled that the State could ask William Poe when and where he next saw the Defendant but that it could not question him about what the Defendant said at that time. The Defendant renewed his motion for mistrial based upon this testimony, which we will discuss later in this opinion. In this section we address only whether the trial court abused its discretion when it admitted this evidence because, as the Defendant claims, it violates Tennessee Rule of Evidence 404(b).

The trial court sustained the objection as to anything the Defendant said during the meeting, and offered to give the jury a curative instruction. The trial court stated that, while it would have preferred for this information not to come before the jury, it did not think that:

Anybody's going to be shocked that somebody gets arrested because they've been charged with a crime, and that if you arrest people, you take them to jail. And I think absent anymore being said, I'll be glad to tell them to place no significance on that, if you want me to, to give some kind of curative instruction. I'll be glad to do it, but my feeling is that we would be calling more attention to it.

We first conclude that the testimony heard by the jury, namely that the next time that William Poe saw the Defendant was seven weeks later when the Defendant had been arrested, did not violate Tennessee Rule of Evidence 404(b). Rule 404(b) allows for the admission of evidence if a material issue exists other than conduct conforming with a

-24-

character trait. Tenn. R. Evid. 404(b). As previously stated, "other purposes" have been defined to include showing the Defendant's intent and also completion of the story. The trial court stated that the State was offering the statements by Poe to show the Defendant's "intent to steal the vehicle," to counter the Defendant's argument that he simply borrowed the vehicle. This is a proper "other purpose" pursuant to 404(b). Further, this testimony completed the story that, while Poe allowed the Defendant to borrow his truck, the Defendant did not return the truck or call Poe to inform him about the status of the truck. The two men did not speak until after the Defendant's arrest in a situation in which the Defendant was not attempting to make contact with William Poe. Finally, we further conclude that the probative value of this evidence is not outweighed by its prejudicial effect. The Defendant is not entitled to relief on this issue.

### 3. Statements During Cross

The Defendant next contends that the trial court erred when it allowed the following testimony from Poe during cross-examination:

[Defendant's Counsel]: Okay. So at that time, you gave him that vehicle, knowing that he intended to hide out, is that correct?

[Poe]: Hide from someone. I didn't know it was the law. Had I known it was the law, he would not have left my driveway, sir, I assure you.

[Defendant's Counsel]: Okay. Did you make an inquiry to see it wasn't from the law?

[Poe]: He said he didn't know who it was. No, I didn't call dispatch to see if they had people there. I didn't call my chief to see if he had people there.

On redirect examination, the State confirmed with William Poe that the Defendant never told William Poe that he was trying to evade police, and William Poe again responded that he would not have allowed the Defendant to borrow his vehicle if he had known the Defendant was attempting to avoid police apprehension.

The record shows that at no point did the Defendant make an objection to this testimony. By failing to contemporaneously object, the Defendant waived the issue regarding Poe's testimony that he would not have allowed the Defendant to borrow his truck had he known that the Defendant was attempting to avoid police apprehension. *See* Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was

reasonably available to prevent or nullify the harmful effect of an error"); Tenn. R. Evid. 103(a)(1). The Defendant is not entitled to relief on this issue.

### F. Motion for Mistrial

The Defendant contends that the trial court improperly denied the Defendant's motion for a mistrial based upon the testimony from William Poe that he saw the Defendant at the jail. After Poe made this statement, the Defendant first objected pursuant to Tennessee Rule of Criminal Procedure Rule 16(A)(1)(a) but then conceded that he had, in fact, had notice of this statement. He then lodged an objection pursuant to Tennessee Rule of Evidence 404(b). The trial court ruled that the State could not question Poe about the conversation that he had with the Defendant but could only question him about the fact that Poe had spoken to the Defendant. The Defendant then moved for a mistrial based upon the reference to him being in custody. The State countered that the testimony had been that the Defendant was in custody and not that he was still incarcerated at the time of the trial. The State argued that the testimony offered was similar to an officer's testimony that he arrested a suspect and took him to jail, which was proper. It asserted that it needed to counter the Defendant's contention at trial that the Defendant "swap[ped]" his Jeep Cherokee with Poe. It intended to do so through's Poe's testimony that the Defendant never called Poe or spoke with Poe until Poe found the Defendant at the jail that day.

The trial court offered to provide a curative instruction about the fact that the jury should not infer the Defendant's guilt based upon his being in jail at any point but said that he did not think that this testimony warranted a mistrial. The trial court explained:

> [B]ased on [Defense Counsel's] earlier statements in opening statement, there will be some [evidence] that . . . this was a loan; it wasn't a theft, and there's no such thing as a theft in this because . . . [Poe] loaned [the truck] to him and those kinds of things. . . . And in fact, he didn't see this defendant, he didn't see his truck, and it was, what, seven or eight months later that he saw the defendant? And the next time he saw him was in the day room at the jail. And the statements are going to be that in between, there was no attempt by defendant to contact the owner of this vehicle and say, "Hey, I had to keep it longer. Is that okay?" or show his intent to steal the vehicle. That's what they're submitting the evidence for.

The trial court then reiterated its offer to provide a curative instruction. The trial court denied the motion for mistrial but instructed the State to limit its questioning of Poe to a time frame of when he next saw the Defendant and to ask Poe not to mention again where he saw the Defendant. Poe then testified that he did not see the Defendant between the time he

allowed the Defendant to leave with his truck until the "end of November, first of December 2008."

The decision of whether to grant a mistrial is within the sound discretion of the trial court. *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). Normally, a mistrial should be declared only if there is a manifest necessity for such action. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). One description of manifest necessity is that, "[i]f it appears that some matter has occurred which would prevent an impartial verdict from being reached," a mistrial must be declared. *Id*. Additionally, a manifest necessity exists when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. Crim. App. 1981). The defendant bears the burden of establishing a manifest necessity. *State v. Seay*, 945 S.W.2d 755, 764 (Tenn. Crim. App. 1996). This Court will not disturb that decision unless there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990); *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

As we previously held, the trial court did not abuse its discretion when it allowed Poe's testimony that Poe next saw the Defendant eight months later when both men were at the jail. We similarly conclude that the trial court did not abuse its discretion when it declined to grant the Defendant's motion for mistrial based upon this testimony. We respectfully disagree with the Defendant that Poe's testimony was intentionally elicited by the State as a comment on the Defendant's custodial status. The State simply asked, "[W]hen was the next time you saw the [D]efendant?" To this, Poe responded that he saw him eight months later when the Defendant was at the jail. This evidence did not warrant a mistrial, the Defendant is not entitled to relief on this issue.

## G. Jury Instructions

The Defendant contends the trial court improperly instructed the jury in two ways. He first contests the trial court's instruction that all witnesses are presumed to be truthful saying that this instruction unfairly commented on his right to remain silent. He contends that this instruction "endorsed the testimony of the State's witness" when it was within the jury's providence to determine whether William Poe was credible. He further contends that the trial court improperly instructed the jury when it stated:

In such instances, if the defendant takes some action with the intent to deprive the owner of the property, and the defendant did so knowingly and without the owner's effective consent, the jury would be justified in returning a verdict of guilty.

The Defendant notes that he objected to this instruction and asked the trial court to instruct the jury that it "may return a verdict of guilt" rather than it "would be justified in returning a verdict of guilty." The Defendant argues that the instruction, as given, was an improper comment on the evidence by the trial court. On appeal, he maintains that the instruction was "improper" and did not "fairly state the applicable law." The State counters first that the Defendant waived this issue by failing to make relevant citations to applicable law in his appellate brief. The State next contends that the trial court properly instructed the jury. The trial court overruled both of the Defendant's objections, finding that both instructions were proper and were included in the Tennessee Pattern Jury Instructions.

A trial court has a "duty to give a complete charge of the law applicable to the facts of the case." *State v. Harris*, 839 S.W .2d 54, 73 (Tenn. 1992). Anything short of a complete charge denies a defendant his constitutional right to trial by a jury. *State v. McAfee*, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987). Tennessee law, however, does not mandate that any particular jury instructions be given so long as the trial court gives a complete charge on the applicable law. *See State v. West*, 844 S.W.2d 144, 151 (Tenn. 1992). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State*, 547 S.W.2d 531 (Tenn. 1977)). In determining whether jury instructions are erroneous, this court must review the charge in its entirety and invalidate the charge only if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998). Because questions of the propriety of jury instructions are mixed questions of law and fact, this Court's review is de novo, with no presumption of correctness. *See State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001). The trial judge does not err when it denies an inaccurate or inapplicable instruction to the case when the charge, in its entirety, "fully and fairly sets out the applicable law." *Id.* (citing *State v. Bohanan*, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987)).

After reviewing the brief, we first conclude that the Defendant has not waived this issue. His brief contains citations to both the general applicable law and the record. While he did not provide citations to support his specific contentions, to hold his issues were waived on this basis would be to preclude all issues of first impression.

We now turn to address whether the trial court improperly commented on the Defendant's right to remain silent or endorsed William Poe's testimony when he instructed the jury that witnesses are presumed to be truthful. We cannot agree with the Defendant that a jury instruction that witnesses are presumed truthful infers that a Defendant who elects not to testify is guilty. The instruction simply states that witnesses who testify, being sworn to tell the truth, are presumed to tell the truth. This instruction is followed or preceded by an

-28-

instruction that a defendant is presumed innocent and that the State must prove his guilt beyond a reasonable doubt. We conclude, as have other courts addressing this issue, that this instruction is proper. *See State v. Torrance Johnson*, No. 02C01-9610-CR-00350, 1998 WL 32687, at *4 (Tenn. Crim. App., at Jackson, Jan. 30, 1998) (holding that instruction that every witness is presumed to tell the truth did not deprive defendant of his constitutional right to the presumption of innocence), *perm. app. denied* (Tenn. Nov. 2, 1998); *see also Lundy v. State*, 752 S.W.2d 98, 103-04 (Tenn. Crim. App. 1987) (holding that the instruction that "all witnesses are presumed to tell the truth", did not deprive defendant of his right to a trial by jury in view of the fact that he did not testify); *State v. Glebock*, 616 S.W.2d 897, 906 (Tenn. Crim. App. 1981). Thus, the Defendant is not entitled to relief on this issue.

Next, we address whether it was improper for the trial court to instruct the jury using the phrase "the jury would be justified in returning a verdict of guilty" rather than "may return a verdict of guilty." The Tennessee Pattern Jury Instructions define "exercise control over property" as:

> [T]he right to direct how property, real or personal, shall be used or disposed. Generally one must possess the right of possession in property in order to exercise control over it. Such possession may be actual or constructive, sole or joint. Also, one may have the right to control property without having a possessory interest. In such instances, if the defendant takes some action with the intent to deprive the owner of the property, and the defendant did so knowingly and without the owner's effective consent, the jury would be justified in returning a verdict of guilty. Anyone who is in a position to take some action that deprives the owner of property is in a position to exercise control.

T.P.I.-Crim. 11.01. This Court has previously used the Tennessee Pattern Jury Instruction to properly define when one exercises control over property. *State v. Ontrell James*, No. W2008-00890-CCA-R3-CD, 2009 WL 1579238, at *2-3 (Tenn. Crim. App., at Jackson, June 5, 2009), *no Tenn. R. App. P. 11 application filed*; *State v. Tammy Garner*, No. M2008-01253-CCA-R3-CD, 2009 WL 1362331, at *4 (Tenn. Crim. App., at Nashville, May 15, 2009), *no Tenn. R. App. P. 11 application filed*. We conclude that this statement is a fair statement of the applicable law. We further conclude that the Defendant's suggested revisions of this instruction make it no more fair or accurate. The Defendant is not entitled to relief on this issue.

## H. Notice of Impeachment

The Defendant next contends that the trial court improperly denied the Defendant's

"Motion to Strike the State's Notice of Impeachment." The State filed a notice of impeachment on the morning of the trial. The State explained the delay to the trial court stating that it usually filed one document with the trial court providing a defendant notice of its intent to seek enhanced punishment and also of impeaching convictions. Since it was not seeking an enhanced punishment in this case, it had overlooked the filing of the notice of its intent to use the Defendant's prior convictions to impeach him if he chose to testify.

The Defendant filed a motion based upon 609(a)(3) to prevent the State from asking the Defendant about his prior convictions if he chose to testify. The Defendant argued that he was not provided "reasonable written notice of the impeaching convictions before trial" as contemplated by that rule. The State countered that the Defendant had actual notice on March 23, 2009, that the State had impeaching convictions because the State had filed a notice of impeaching convictions before his previous trial in companion case number 08-081. The State cited *State v. Thompson*, 36 S.W.3d 102 (Tenn. Crim. App. 2000), for the proposition that any time before trial is reasonable notice. The trial court ruled that the State had substantially complied with the rule. The court, therefore, granted the State's request to impeach the Defendant with some of his prior convictions. The trial court ruled inadmissible any convictions more than ten years old and also the convictions the Defendant received in case number 08-081, finding that the prejudicial effect of those convictions would far outweigh any probative value because of the close proximity of the date of those crimes and the date of the crime alleged to have occurred in case number 08-082.

On appeal, the Defendant contends that this Court has interpreted the phrase "prior to trial" to mean sometime earlier than "the day of the trial when the jury is waiting in the hall." *See State v. Hamilton*, 628 S.W.2d 742, 744 (Tenn. Crim. App. 1981) (interpreting Tennessee Rules of Criminal Procedure 12). The State counters first that it provided proper notice and that, even if the notice was untimely, any resulting error was harmless.

Rule 609 of the Tennessee Rules of Evidence states that the credibility of a witness may be attacked by evidence of prior convictions if certain prerequisites are met. First, the conviction must be punishable by death or imprisonment over one year or must involve a crime of dishonesty or false statement. Tenn. R. Evid. 609(a)(2). Secondly, if the witness to be impeached is a criminal defendant, the State must give notice prior to trial of its intent to use the conviction for impeachment. Tenn. R. Evid. 609(a)(3). Finally, upon request, the court must determine that the probative value of the prior conviction on the issue of credibility outweighs its prejudicial effect on substantive issues. Tenn. R. Evid. 609(a)(3). Rule 609(b) also requires that the convictions have been within the ten years previous to a defendant's current charge.

This Court has previously held that notice of the State's intent to use prior convictions

as impeachment filed on the morning of trial was "not reasonable" and was "not timely." *State v. Catherine Susan (Suzanne) Smith and William C. Hindman*, No. 03C01-9106-CR-00174, 1991 WL 233247, at *1 (Tenn. Crim. App., at Knoxville, Nov. 13, 1991), *perm. app. denied* (Tenn. Mar. 30, 1992). In *Smith*, the Court went on to conclude that the error therein was harmless. *Id.*

In the case presently before us, we conclude that the notice provided by the State, on the morning of trial, was not reasonable and not timely. We, however, find any error harmless. The Defendant was indicted in this case, case number 08-082, at the same time as he was indicted in case number 08-081. The trial in case 08-081 was held on April 14, 2009, seventy days before the trial in this case began on June 23, 2009. Before the trial in case 08-081, on March 23, 2009, the State filed a "Notice of Intent to Seek Enhanced Punishment and/or Notice of Impeaching Convictions." In its notice, the State declared its intent to seek an enhanced punishment and/or impeach the Defendant based upon the following convictions against the Defendant in the state of Michigan: three convictions from 2003 and 2006 for larceny by conversion in an amount over $1000; one 1995 conviction for larceny in an amount over $1000; one 1994 conviction for carrying a concealed weapon; and two 1996 convictions for larceny by check. According to the notice of impeachment filed in this case, case number 08-082, these were the same convictions that the State sought to use to impeach the Defendant if he testified. The Defendant, therefore, had actual notice on March 23, 2009, of these convictions and also of the State's plan to use them to impeach the Defendant if he testified in case 08-081. Therefore, while the notice provided by the State in this case was not timely, the error is harmless. The Defendant is not entitled to relief on this issue.

## I. Sufficiency of Evidence

The Defendant next contends that the evidence was insufficient to support his conviction for theft of property valued at an amount greater than $10,000. Specifically, he asserts the proof failed to show that he obtained or exercised control over William Poe's truck without effective consent or that he exercised control over William Poe's truck with the intent to deprive him of the property. The State counters that sufficient evidence was presented to sustain his conviction.

In Tennessee, "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103 (2003). The grading of theft is based on the value of the property, and theft of property valued at more than $10,000 but less than $60,000 is a Class D felony. T.C.A. § 39-14-105(1)-(5). According to *State v. Amanns*, for a conviction of theft, the State must prove the defendant: (1) knowingly obtained or exercised control over property; (2) did not have the owner's effective consent; and (3)

-31-

intended to deprive the owner of the property. 2 S.W.3d 241, 244-45 (Tenn. Crim. App. 1999). Additionally, theft by obtaining property and theft by exercising control over the property are treated as the same offense. *State v. Kennedy*, 7 S.W.3d 58, 70 (Tenn. Crim. App. 1999). The Tennessee Pattern Jury Instructions define "exercise control over property" as:

> the right to direct how property, real or personal, shall be used or disposed. Generally one must possess the right of possession in property in order to exercise control over it. Such possession may be actual or constructive, sole or joint. Also, one may have the right to control property without having a possessory interest. In such instances, if the defendant takes some action with the intent to deprive the owner of the property, and the defendant did so knowingly and without the owner's effective consent, the jury would be justified in returning a verdict of guilty. Anyone who is in a position to take some action that deprives the owner of property is in a position to exercise control.

T.P.I.-Crim. 11.01.

After considering the facts in the light most favorable to the State, we conclude that the evidence presented was sufficient to support the Defendant's conviction for theft of property. First, he knowingly exercised control over the property. *See Amanns*, 25 S.W.3d at 244-45. The evidence proved that the Defendant took the truck, drove the truck, and abandoned the truck in Kentucky. The Defendant admitted as much through his counsel's arguments. The Defendant contended, however, that he had the owner's consent to be in possession of the truck, making the State unable to prove the second element of theft. *See id.* We cannot agree. The evidence proved that the Defendant remained in possession of the truck long past the time contemplated by he and William Poe. William Poe testified that the Defendant asked to borrow William Poe's truck and promised to return the truck the next day. The Defendant then absconded with the truck, eventually abandoning it in Kentucky several months later, where it was found by police who ultimately returned it to Poe. Moreover, the Defendant never made any attempt to contact William Poe to request that he be allowed to use William Poe's truck for a longer period of time or to inform William Poe that the Defendant was abandoning the truck in another state. While Poe agreed to allow the Defendant to borrow his truck for one night, the Defendant's continued possession of Poe's truck supports the jury's finding that the Defendant did not have Poe's consent to have the truck beyond one night. We also conclude that the evidence supports the jury's finding that the Defendant intended to deprive Poe of his property. *See id.* The Defendant used a false identity when introducing himself to William Poe and maintained this false identity throughout the duration of their relationship. The Defendant told William Poe detailed

stories about his wealth and his being sought after by men involved with casinos. He told William Poe that there were people who were after him, so he needed Poe's truck to avoid their detection. After Poe gave the Defendant possession of his truck, the Defendant fled the area, only to be apprehended later by police. This evidence proves that the Defendant intentionally deprived Poe of the possession of his truck. Finally, the evidence that Poe's truck had a value of between $10,000 and $60,000 is not controverted. The evidence is, therefore sufficient to sustain the Defendant's conviction, and he is not entitled to relief on this issue.

## J. Sentencing

The Defendant contends that the trial court improperly sentenced him to the maximum sentence allowable within his range and that the trial court erred when it ordered that his sentence in this case, case 08-082, run consecutively with his sentence in case 08-081 and also another sentence in Michigan.

## 1. Sentencing Facts

The trial court held a sentencing hearing[4] to sentence the Defendant for his convictions in both case number 08-081 and this, case 08-082. The following evidence was presented relevant to this case: The Defendant's presentence report indicated that the Defendant, who was thirty-six at the time of sentencing, dropped out of school in the eleventh grade, that he has gone by at least eight different aliases, and that, at the time of sentencing, an "escape from prison" charge was pending against him in Michigan.

The report included copies of seven Michigan judgments of convictions entered against the Defendant. According to these judgments, between 1993 and 2006, the Defendant was adjudged guilty of the following offenses in Michigan: one count of "larceny by conversion $1,000-$20,000," for which the Defendant received a five-year probation sentence; one count of "larceny by conversion-$10" as a "habitual offender 4th con [sic]," for which the Defendant was sentenced to a minimum of forty months and a maximum of twenty years and ordered to pay $16,500 in restitution; one count of "larceny by conversion -$10" as a "habitual offender 4th con [sic]," for which the Defendant was sentenced to a minimum of forty months and a maximum of twenty years; one count of "weapons-carrying concealed," for which the Defendant received a twenty-four month probation sentence; two counts of "false pretenses 0/$100.00," for which the Defendant received two sentences of

_____

[4]The transcript of the sentencing hearing was not included in this record on appeal. It was, however, included in the companion case, *Sweet I*, No. E2010-00728-CCA-R3-CD. We therefore take judicial notice of the *Sweet I* record for purposes of this appeal.

confinement for a minimum of five years and a maximum of fifteen years and was ordered to pay $12,200 in restitution; one count of "check no account," for which the Defendant received a sentence of confinement for a minimum of one year and a maximum of two years; and one count of "attempted uttering & publishing," for which the Defendant received a two-year probation sentence and was ordered to pay $3,486.21 in restitution.

The officer who prepared the presentencing report noted that the Michigan Department of Correction website indicated that at least three of the Defendant's larceny by conversion were for "larceny by conversion-$10,000 to $20,000."

The report also indicated that in May 2009 the Defendant was convicted in Arizona of the following offenses: identify theft; theft up to $500; convicted felon in possession of a weapon; and theft of vehicle. The Defendant received a total effective sentence of three years and six months for these convictions, and he was ordered to serve one year of this sentence in confinement. The conduct underlying the Arizona convictions took place after the Defendant committed the crimes in this case and fled to Arizona from Tennessee.

Additionally, the report indicated that the Defendant had been convicted on April 14, 2009, in Tennessee in case number 08-081, for two counts of forgery and two counts of criminal simulation.

The Defendant reported to the probation officer preparing the report that he suffered from post-traumatic stress disorder from childhood abuse and that, as an adult, he had been treated for depression and bi-polar mood disorder. The Defendant reported that he had been hospitalized three times due to his mental health issues, the impetus for one of these hospitalizations being a suicide attempt. Because the Defendant refused to authorize the officer preparing the report to access his medical records, the Defendant's description of his mental health history could not be confirmed.

The Defendant's report indicated he had one child with Donna Poe, who the presentence report identified as the Defendant's "cohabiting spouse," and he had two children from a previous marriage. He reported having been the owner/operator of a self-run business, "Finishline Custom Auto" and head of public relations for "Fabrizio Boccardi" in Las Vegas, Nevada. No record could be found of Finishline Custom Auto, and Mr. Boccardi of "Fabrizio Boccardi" denied ever having met or employed the Defendant.

The Defendant reported having over $1,000,000 worth of "4x4 trucks," "vehicles," and "sporting and water craft," all of which he claimed were tied up "in probate." He declined to include information about his bank accounts on the basis that "any and all bank accounts are not subject to U.S. tax laws." He claimed, however, that he had in his control

$3,500,000, all of which he said was "illegally obtained" and which he was "willing to pay . . . to the victims and or court."

William Poe submitted a victim impact statement, in which he stated, "I trust people less now and will not loan anything I have for any reason. I have no use for anyone who is found to be a thief, nor does my family. We have all learned to watch and not trust those who we do not really know." Poe asked that the Defendant be sentenced to the maximum sentence allowable by law.

After hearing the evidence and arguments of the parties, the trial court sentenced the Defendant, stating:

> In 08-082, enhancement factors have been shown under (1), of course; (8) is applicable as well; (13) is applicable, on escape status; (14), I'm going to find that, but not really put any emphasis on it. I think in effect the crime itself pretty well determines on a theft there. I mean, he was obviously taking something, but I'm not going to place really any significance on that in what I do today.

The trial court sentenced the Defendant, a Range I offender, to six years. The trial court went on to consider whether the Defendant should be confined or placed on probation. During that consideration, it stated:

> I'm also going to observe for the record several things that will affect what I do here today. I have found [the Defendant's] attitude the entire time he has been in this court totally offensive. I have found he has been one of the most arrogant defendants I have ever experienced in my life, as far as his attitude toward the Court when he's been here, toward anything else going on. He has, and I specifically for reference and for the record, one of the, the exhibit number nine, the affidavit of indigency that he filed where he listed he had millions of dollars in offshore Malaysian banks, six million dollars in Hong Kong. He listed assets in excess of hundreds and hundreds of thousands of dollars. He owns property, he alleged, in excess of two million dollars . . . and he kept insisting he would hire his own attorney when – and the attitude I found then, and he's been consistent anytime he's been in court, was one of total arrogance and disdain for everything that has to do with our judicial system. He continued that today. There was some lady here earlier. She's no longer here, but they made oogle eyes at each other and found great mirth, laughing at certain things the State said, certain arguments that you made. She's no longer here. She will probably be his next victim, if he con —

-35-

. . . .

His attitude here today, his total – has been a total disgrace, and consistent with his total arrogance that he showed to the whole judicial system every time he's been into this court.

The trial court then ordered that the Defendant's sentences run consecutively, stating:

The 16 years I sentenced him on each case in 08-081 . . . I . . . run those concurrent with each other. I run them though consecutive – the 16 year sentences I run consecutive . . . to . . . I do think under the provisions of 40-35-115(b), under determining whether his sentences are to run consecutive or not, subparagraph (1) has been shown, that he, ". . . is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood." It's obvious he takes advantage, monetary advantage of anybody he can sink his claws into and suck every . . . amount of blood he can get out of them. I find that subparagraph (2) is also applicable. He is, ". . . an offender whose record of criminal activity is extensive. It's evidence he has no intention to, complying with the rules of any state that he is in, and I do think that the consecutive sentencing requirements have been met. So I do run the 16 year[] [sentence in case 08-081] consecutive to the six year sentence for a total sentence of 2[2] years.

## 2. Sentencing Analysis

The Defendant contends that the trial court improperly sentenced him to the maximum sentence allowable within his range and that the trial court erred when it ordered that his sentence in this case, case 08-082, run consecutively with his sentence in case 08-081. When a defendant challenges the length, range, or manner of service of a sentence, this Court must conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2006). This presumption, however, is conditioned upon the affirmative showing in the record that the trial court properly sentenced the defendant. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). As the Sentencing Commission Comments to this section note, the burden is on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts. If the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration to the factors and principles relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result was preferred. T.C.A. § 40-35-103 (2006), *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal

conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In conducting a de novo review of a sentence, we must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2009); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The Criminal Sentencing Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2) and (d) (2006); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).

In order to ensure "fair and consistent sentencing," the trial court must "place on the record" what, if any, enhancement and mitigating factors it considered as well as its "reasons for the sentence." T.C.A. § 40-35-210(e). Before the 2005 amendments to the Sentencing Act, both the State and a defendant could appeal the manner in which a trial court weighed enhancement and mitigating factors it found to apply to the defendant. T.C.A. § 40-35-401(b)(2) (2003). The 2005 amendments deleted as grounds for appeal, however, a claim that the trial court did not properly weigh the enhancement and mitigating factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 8-9. In summary, although this Court cannot review a trial court's weighing of enhancement factors, we can review the trial court's application of those enhancement factors. T.C.A. § 40-35-401(d) (2006); *see Carter*, 254 S.W.3d at 343.

### a. Enhanced Sentence

The Defendant contends that the trial court improperly sentenced him to the maximum allowable sentence within his range because it based its sentence on improper considerations, including the perception of the Defendant's attitude. In support of this argument, he references the trial court's statement that the Defendant's sentence was based in part upon

his "total arrogance and disdain for everything that has to do with our judicial system."

During the sentencing hearing, the trial court did, in fact, mention the Defendant's attitude and demeanor during court proceedings. It did so, however, after it found four enhancement factors applicable to the Defendant's sentence and after setting the length of the Defendant's sentence. The trial court mentioned the Defendant's demeanor when declining to order the Defendant serve part or all of his sentence on probation. At this point in the proceedings, the trial court also mentioned the Defendant's lack of candor when he filled out his indigency affidavit. This Court has previously held that a defendant's lack of candor is a proper consideration for a trial court when denying probation in that it reflects upon a defendant's potential for rehabilitation. *See State v. Bunch*, 646 S.W.2d 158 (Tenn.1993); *State v. Shawn E. Dodd*, No. 03C01-9508-CC-00214, 1996 WL 393926, at *1 (Tenn. Crim. App., at Knoxville, July 16, 1996), *no Tenn. R. App. P. 11 application filed*. We conclude that, in this case, the trial court based the length of the Defendant's sentence upon four enhancement factors that each were properly applied. The trial court's consideration of the Defendant's candor and demeanor was properly applied to the issue of probation. The Defendant is not entitled to relief on this issue.

## B. Consecutive Sentencing

The Defendant contends the trial court improperly sentenced the Defendant by ordering that his sentence in this case, case number 08-082, run consecutively to his sentence in case number 08-081. He notes that the trial court based its decision, in part, upon a finding that the Defendant is a "professional criminal who had knowingly devoted himself to criminal acts as a major source of livelihood" and that the Defendant is an offender whose record of criminal activity is extensive. He asserts that the trial court's ruling resulted in a twenty-two year effective sentence, which he states is not reasonably related to the severity of his offenses. The State counters that the trial court properly ordered consecutive sentences.

If an offender meets one or more statutory criteria in Tennessee Code Annotated section 40-35-115, whether he or she should be sentenced consecutively or concurrently is within the sound discretion of the trial court. *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, that at least one of seven factors exists. T.C.A. § 40–35–115(b)(1)-(7). In addition to these criteria, consecutive sentencing is subject to the general sentencing principle that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102(1), 103(2); *see also State v. Imfeld*, 70 S.W .3d 698, 708 (Tenn. 2002). Rule 32(c) of the Tennessee Rules of Criminal Procedure instructs a trial court

to explicitly recite on the judgment its reasons for imposing a consecutive sentence.

The sentencing criteria used by the trial court in this case are factors (1) and (2), which allow a trial court to order consecutive sentencing if:

(1) The defendant is a professional criminal who has knowingly devoted the defendant' s life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

T.C.A. § 40-35-115(b)(1)-(2). A trial court need only find one statutory criterion to support an imposition of consecutive sentences. *See State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995).

The trial court did not, however, apply the "dangerous offender" criterion enumerated in Tennessee Code Annotated section 40-35-115(b)(4). When a trial court finds the defendant is a "dangerous offender," it must also determine what has generally become referred to as the "*Wilkerson* factors," that is whether the consecutive sentences: (1) are reasonably related to the severity of the offenses committed; (2) serve to protect the public from further criminal conduct by the offender; and (3) are congruent with the general principles of sentencing. *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn.1995).

The Defendant's argument in this case that his sentence is not "reasonably related to the severity of the offenses committed" and that consecutive sentences do not serve "the public from further criminal conduct" by him is misplaced. Those considerations must be made when a trial court orders consecutive sentences based upon the "dangerous offender" criterion of the consecutive sentencing statute.

The trial court, however, considered two other criteria, as listed above, and the record supports the application of those criteria. The record evinces that the Defendant has been convicted of a multitude of crimes, mostly involving theft and forgery, in Michigan, Arizona, and Tennessee. It is also appears from the record that the Defendant's crimes were the primary source of his income. The trial court did not abuse its discretion when it found that these two criteria applied and ordered consecutive sentences. Under these circumstances, the trial court must only determine that the length of the sentence is "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." *See* T.C.A. § 40-35-102(1), 103(2); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). We conclude that the Defendant's twenty-two year sentence is, in fact, justly deserved and no greater than deserved for the offenses he committed. The trial court, therefore, properly sentenced the Defendant.

## III. Conclusion

After a thorough review of the record and relevant authorities, we conclude the Interstate Compact did not bar the State from prosecuting the indictments underlying the Defendant's convictions. We also conclude there exists no error in the judgment of the trial court. Accordingly, we affirm that judgment.

_____
ROBERT W. WEDEMEYER, JUDGE